UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| QUALITY LEASING CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 1:20-cv-00954-MJD-JMS |
| | ) |
| ATOMIC DOG, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Plaintiff's motion for summary judgment [Dkt. 64]. The motion is fully briefed, and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in his favor." *Pack v. Middlebury Cmty. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021) (citing *McAllister v. Innovation Ventures*, 983 F.3d 963, 967 (7th Cir. 2020)).

> Summary judgment is a critical moment for a non-moving party. It must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018). Neither will the mere scintilla of evidence. *Grant*, 870 F.3d at 571.

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, "as it is not the court's job to 'scour the record in search of evidence to defeat a motion for summary judgment.'" *Hildreth v. Butler*, 960 F.3d 420, 429 (7th Cir. 2020), *cert. denied,* 141 S. Ct. 1527 (2021) (quoting *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)).

## II.  Background

The background facts of record, viewed in the light most favorable to the Defendants, as the non-moving parties, are as follow. Additional relevant facts of record are set forth in the Discussion section below.

The parties in this case entered into a series of agreements pursuant to which Plaintiff Quality Leasing Co., Inc. ("Quality") agreed to provide financing for distillery equipment to be purchased by Defendant Atomic Dog, LLC, d/b/a Jack's Hard Cider ("Atomic").

First, in February 2019, Quality and Atomic executed a Master Equipment Finance Agreement ("Master Agreement") that provided for equipment to be financed under subsequent "Supplements" to the Master Agreement. [Dkt. 65-2 at 11.] At the same time, Defendants Excel Services Corporation ("Excel") and Donald Ray Hoffman executed agreements in which they guaranteed the performance of all of Atomic's contractual obligations and liabilities to Plaintiff. [Dkt. 65-2 at 18], [Dkt. 65-2 at 21].

The Master Agreement contains the following provisions:

> 1. **Financing of Equipment; Security Interest.**  This Master Agreement contains provisions under which Lender will from time to time provide financing for Borrower to purchase certain items of personal property . . .described on each

> equipment Supplement incorporating the terms of this Master Agreement (each, a "Supplement").  Each Supplement will constitute a separate agreement and the term "Agreement" refers to a Supplement and this Master Agreement as incorporated therein.
>
> \*\*\*
>
> 2. **Term**  The term of each Agreement shall be the number of months stated in the Supplement(s) executed by the Parties (plus any partial month, if the commencement date is other than the first day of a month), commencing on the date stated in the Supplement(s) (the "Term").  Borrower authorizes Lender to insert such commencement date, provided that such date shall not be earlier than the date of delivery to Borrower and acceptance of all or a substantial part of the Equipment.
>
> \*\*\*
>
> **4. Disclaimer of Warranty for Equipment**. BORROWER REPRESENTS THAT IT HAS SELECTED THE EQUIPMENT PRIOR TO HAVING REQUESTED LENDERTO FINANCE THE SAME…  Borrower agrees to look solely to the manufacturer, the seller or the carrier of the Equipment (which are solely responsible for supplying Borrower with all literature and manuals respecting the Equipment) for any claims arising from any defect, breach of warranty, failure or delay in delivery, misdelivery or inability to use the Equipment for any reason whatsoever and Borrower's liabilities to Lender hereunder shall not in any manner be affected thereby, including (without limitations) Borrower's obligations to pay Lender all payments and other amounts payable under an Agreement.

[Dkt. 65-2 at 12.]  Finally, the Master Agreement provides that Quality may recover "legal fees and other costs and expenses incurred by reason of an Event of Default." [Dkt. 65-2 at 14.]

"Event of Default" is defined as, *inter alia*,

> any one or more of the following: (a) the failure by [Atomic Dog] to make any payment when due hereunder or the failure by [a guarantor] to pay when due any Liabilities [of Atomic Dog]; (b) the failure of [Atomic Dog or any guarantor] to observe or perform (i) any other agreement or obligation to be observed or performed hereunder or under any agreement, document or instrument delivered to [Quality] by or on behalf of [any guarantor] or otherwise relating to the Liabilities [], or (ii) any other obligation of a guarantor to [Quality].

[Dkt. 65-2 at 13-14.]

3

The parties subsequently entered into three Supplements to the Master Agreement. The terms and conditions contained in the Master Agreement are specifically incorporated into each Supplement.

*Supplement 30151*

Supplement 30151 provides for the finance of distillery equipment described generally as a "2019 Kreuzmayr K2B 1500." [Dkt. 65-2 at 50.] The record contains three documents relating to Supplement 30151. The first, entitled Supplement to Master Equipment Finance, notes that the net cost of the equipment to be financed is $328,350.01 and requires Atomic to pay Quality seventy-two monthly payments of $6,272.63, commencing on June 20, 2019. *Id.* The second is a Certificate of Delivery and Acceptance, acknowledging receipt of the equipment set forth in Schedule A. Both of these documents are dated June 5, 2019, and are executed by Atomic, but no date appears with Atomic's signatures. The third document related to Supplement 30151, Schedule A, was executed by Atomic on June 14, 2019. *Id.* at 53. Schedule A lists each of the individual pieces of equipment to be financed pursuant to Supplement 30151.

Quality made a payment of $328,350.01 to Juicing Dot Systems, Inc., on June 24, 2019, for the equipment financed pursuant to Supplement 30151. *Id.* at 7. There is no dispute that the equipment listed in Schedule A to Supplement 30151 was delivered to Atomic and that Quality perfected a first priority security interest in that equipment. *Id.*

*Supplement 30120*

Supplement 30120 provides for the finance of distillery equipment described generally as "3 Criveller hard cider fermentation tanks, 20hl w/ sight gauges & stainless steel dimpled jackets," which was to be provided by Criveller Company. *Id.* at 41. There are four documents relating to Supplement 30120 in the record. The first, entitled "Supplement to Master Equipment

4

Finance Agreement," is dated April 1, 2019.  It requires Atomic to pay Quality seventy-two monthly payments of $1,301.55, with the first payment due on January 20, 2020.  It was executed by Atomic, but no date appears with the signature.  *Id.* at 38.  The second document, entitled Certificate of Delivery and Acceptance, also is dated April 1, 2019, and also was executed by Atomic without a date with the signature.  It indicates that the equipment "is still being manufactured."  *Id.* at 40.  The third document, entitled "Pre-Funding Agreement" was executed by Atomic on October 23, 2019.  *Id.*  It requires Atomic to pay Quality seventy-two monthly payments of $1,301.55, commencing upon delivery, and requires delivery of the equipment on or before January 20, 2020.  *Id.*  It further provides the following:

> 6.  The full deposit owed to Criveller Company is to be broken down in the following manner: [Atomic] to pay $3,327.72 to [Quality] and [Quality] to pay $33,277.25 and is effective upon signing of the agreement. [Quality] will advance funds in US dollars to the vendor of the required deposit in the following manner:
>
>   a.  First draw (which represents 50% deposit) of $33,277.25 upon execution of the agreement.  The pro-rata will be calculated at a daily rate of $7.39 or the draw period until the second draw request.
>
>   b.  Second draw of $33,277.25 within sixty (60) days of the first draw or when requested by the vendor at completion & installation of the equipment.
>
>   c.  At the time of the second draw the pro-rata for the first draw will be collected prior to release of the second draw.
>
>   d.  First payment to be deducted on 1-20-2020.
>
> 7.  All equipment must be delivered by 1-20-20.  Should any of the equipment not be delivered, then additional payments may be due on the deposits pre-funded on or before, [sic] for whatever reason, [Quality] may at its option, require you to pay [Quality] any funds paid to the vendor.  We may in such case elect to either delete such equipment from our commitment to finance, or add it later and revise your monthly payment amount.

*Id.* at 41. The fourth document, Schedule A, lists each of the individual pieces of equipment to be financed pursuant to Supplement 30120. It was executed by Atomic on December 18, 2019. *Id.* at 43.

Quality made two payments of $33,277.25 to Criveller Group, one on May 29, 2019, and the other on January 2, 2020. *Id.* at 6. There is no dispute that the equipment listed in Schedule A to Supplement 30120 was delivered to Atomic. Quality perfected a first priority security interest in the equipment financed by Supplement 30120. *Id.* at 45.

### *Supplement 30114*

Supplement 30114 provides for the finance of distillery equipment described generally as a "Craft Block 24/400 rotary counter pressure canning line & 150 BBL Beer Tank." *Id.* at 26. This equipment was to be provided by Palmer Canning Systems ("Palmer"). [Dkt. 66-1 at 3.]

Supplement 30114 consists of the same set of documents as Supplement 30120. The "Certificate of Delivery and Acceptance," was executed by Atomic on February 6, 2019, the same date as the Master Agreement. It indicated that the equipment was still being manufactured. [Dkt. 65-2 at 26.] The remaining documents relating to Supplement 30114 were executed by Atomic in June 2019. On June 13, 2019, Atomic executed Schedule A, which was dated June 3, 2019. *Id.* at 30. The following day, Atomic executed the "Pre-funding Agreement," which requires Atomic to pay Quality seventy-two monthly payments of "approximately $15,396.97," "commencing upon delivery." *Id.* at 27. It also contains the following provisions:

> 6. The full deposit owed to Palmer Canning Systems is to be broken down in the following manner: [Atomic] to pay $42,285.00 to [Quality] and [Quality] to pay $408,383.15 and is effective upon signing of the agreement. [Quality] will advance funds to the vendor of the required deposit in the following manner:

6

> a. First draw (which represents 50% deposit) of $408,383.15 upon execution of the agreement. The pro-rata will be calculated at a daily rate of $88.15 of the draw period until the second draw request.
>
> b. Second draw of $408,383.15 within thirty (90) [sic] days of the first draw or when requested by the vendor at completion & installation of the equipment.
>
> c. At the time of the second draw the pro-rata for the first draw will be collected prior to release of the second draw. The full amount of pro-rata due for the second draw will be collected in addition to the first payment at the time of the final funding.

7. All equipment must be delivered by 6-20-19. Should any of the equipment not be delivered, then additional payments may be due on the deposits pre-funded on or before, [sic] for whatever reason, [Quality] may at its option, require you to pay [Quality] any funds paid to the vendor. We may in such case elect to either delete such equipment from our commitment to finance, or add it later and revise your monthly payment amount.

***

By signing below you accept all terms regarding this pre funding agreement and the above described property. IF YOU THEREAFTER REFUSE TO ACCEPT THE PROPERTY, CANCEL THE ORDER, IF THE PROPERTY IS NOT BUILT TO DESIRED SPECIFICATIONS OR IS NOT DELIVERED, YOU SHALL BE LIABLE TO US ALL [sic] MONIES ADVANCED, ALL EXPENSES WE INCUR IN CONNECTION WITH THE ACQUISITION OF THE PROPERTY BEING FINANCED AND FOR THE COSTS OF COLLECTION INCLUDING REASONABLE ATTORNEYS' FEES.

[Dkt. 65-2 at 27-28.] Atomic also executed an Authorization for Auto Payment relating to Supplement 30114, agreeing to have a monthly payment of $15,396.97 withdrawn on the 20th of each month beginning on July 20, 2019, and acknowledged (by initialing) an Invoice dated June 14, 2019, showing a payment due of $26,503.87, which included a "payment" of $15,396.97 and "interim rent" (presumably, the "pro-rata" referenced above) of $11,106.90. *Id.* at 29, 32.

Quality made the following payments for the equipment financed under Supplement 30114:  (1) $408,383.15 to Palmer Canning Systems on February 8, 2019;[1] (2) $28,875.00 to Criveller Group[2] on March 20, 2019; and (3) $408,383.15 to Palmer Canning Systems on June 14, 2019.  *Id.* at 5.  Additional facts relating to Quality's second payment to Palmer are discussed in detail in the Discussion section below.  Quality perfected a first priority security interest in the equipment financed by Supplement 30114.  *Id.* at 34.

Although Palmer received full payment from Quality in June 2019, Palmer did not deliver any equipment identified in Supplement 30144 until October 2019.  It failed to deliver "three significant components, know as a Filtec, a Tray Former and a Cartoner.  Atomic Dog's understanding of the cost of this equipment is approximately $300,000."  [Dkt. 66-1 at 3] (Hoffman Affidavit).  Atomic was unable to obtain these items from Palmer, and eventually learned in January 2020 that Palmer had declared bankruptcy and would not be supplying the missing components.  Atomic therefore obtained them from another supplier at an additional cost.  *Id*. at 3-4.

Atomic contends it made the required payments under all three Supplements through January 20, 2020, "with the exception of certain months in which [Quality] permitted [Atomic]

---

[1] Quality acknowledges that "[u]nder the express terms of the Pre-funding Agreement incorporated into Supplement 30114, Quality was required to make an initial advance of $408,383.15 to Palmer Canning **upon the execution of the agreement**."  [Dkt. 68 at 4] (citing Fogle Aff., Ex. 4, p. 4 at ¶ 6(a), (b)) (emphasis added).  Quality does not explain why it made the first payment in February 2019 when the document it cites to [found at Dkt. 65-2] was not executed until June 14, 2019.

[2] Supplement 30114 does not mention any payments to Criveller Group.  However, the three payments made by Quality (two to Palmer and one to Criveller) total the "net cost of equipment financed" listed for Supplement 30114.  *See* [Dkt. 65-2 at 24] (listing net cost as $845,641.30).

to defer payment."[3]  *Id.* at 4.  On January 31, 2020, however, Atomic informed Quality of Palmer's failure to deliver the components and ceased making payments under all of three of the Supplements.  As explained by Hoffman:

> I proposed that payments continue on Supplement 30114, which I referred to as the "canning line," on a prorated basis for the equipment actually delivered by [Palmer].  Because [Atomic] was making combined monthly payments on all three supplements, I wanted to determine this figure before continuing to make payments.  Accordingly, I informed [Quality's] representatives that [Atomic] would not be making further payments until the prorated figure for Supplement 30113 could be determined.

*Id.* at 4.  Quality took the position that Atomic remained responsible for the entire amount it paid to Palmer under Supplement 30114.  This lawsuit resulted.

### III.  Discussion

There is no dispute that Atomic last made payments to Quality in October 2019. Quality's position is simple:  By ceasing payment, Atomic has breached its obligations under the three Supplemental Agreements.  Quality therefore seeks summary judgment on each count of its Complaint.  Counts I-V are breach of contract claims alleging that Atomic breached its obligations under each of the Supplements and Excel and Hoffman breached their guaranties thereof.  Count VI is a replevin claim seeking possession of all of the equipment financed under each of the three Supplements.  Defendants, in turn, argue that Quality materially breached its obligations under Supplement 30114 by making full payment to Palmer before the equipment was delivered, and therefore Quality may not recover for any subsequent breach by Atomic.  The parties' arguments are addressed, in turn, below.

---

[3] Quality asserts that Atomic has not made any monthly payments under any of the Supplements since October 2019.  Atomic does not dispute that fact.

### A. Applicable Law

Under Indiana law, which the parties agree applies to Quality's claims in this case, the Court's primary task when construing the meaning of a contract is "'to determine and effectuate the intent of the parties.'" *Emmis Commc'ns Corp. v. Illinois Nat'l Ins. Co.*, 323 F. Supp. 3d 1012, 1022 (S.D. Ind. 2018), *aff'd*, 937 F.3d 836 (7th Cir. 2019) (quoting *Whitaker v. Brunner*, 814 N.E.2d 288, 293 (Ind. Ct. App. 2004)).

> "First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict."

*Id.* (quoting *Whitaker*, 814 N.E.2d at 293-94 (Ind. Ct. App. 2004)).

"'A word or phrase is ambiguous if reasonable people could differ as to its meaning'"; however, "[a] term is not ambiguous solely because the parties disagree about its meaning." *Id.* (citing *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016)). "In contracting, clarity of language is key. . . . When there is ambiguity in a contract, it is construed against its drafter." *MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004) (citations omitted); *see also Thompson v. Wolfram*, 162 N.E.3d 498, 506 (Ind. Ct. App. 2020); *Buskirk v. Buskirk*, 86 N.E.3d 217, 224 (Ind. Ct. App. 2017).

### B. The Meaning of Supplement 30114

Defendants' argument in defense of the instant motion hinges on the meaning of certain language in Supplement 30114. Specifically, Defendants argue that Quality was not permitted to release the second payment to Palmer until **after** Atomic received the equipment from Palmer. Defendants point to the provision in the Pre-Funding Agreement that provides for the second draw of $408,383.15 to be paid by Quality to Palmer "within thirty (90) [sic] days of the first draw or when requested by the vendor at completion and installation of the equipment." [Dkt. 65-2 at 27.] Defendants argue that

> This contract language, which was prepared by [Quality], clearly establishes that [Quality] was to make payments in two draws, one upon execution of Supplement 30114 on June 14, 2019, and one later. While the language is not clear (through no fault of Defendants) regarding whether the second payment would be made within thirty or ninety days it is clear that the second payment was targeted to insure that payment was made at completion and installation of the equipment.

[Dkt. 66 at 6.]

Quality takes the position that the provision quoted above is unambiguous and that it permitted Quality to make the second payment to Palmer "either within 90 days of the original payment" or "upon the vendor's request after the delivery and installation of the equipment." [Dkt. 65 at 17.] This reading is, frankly, nonsensical; it would mean that Quality unilaterally could choose to make the payment any time within ninety (or perhaps thirty) days after the first draw, but if it did not choose to do so, then, and only then, it could not make the payment until "requested by the vendor at completion and installation of the equipment." "'We will not bend the language of a contract to create an ambiguity when none exists, but neither will we follow a literal interpretation when [to do so] would lead to an unreasonable or absurd result.'" *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (quoting *Chi. Bd. of Options Exch.*

*v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 258 (7th Cir. 1983)).  The reading urged by Quality, while perhaps consistent with the literal words on the page, is simply not a reasonable reading of the term in question.  And, in any event, Quality did neither of those things with regard to Supplement 30144.[4]

Putting aside the obvious ambiguity of the phrase "thirty (90)," the language in question, viewed in isolation, is ambiguous.  Clearly it is intended to put both a temporal (ninety, or perhaps thirty, days) limit on Quality's obligation to pay the second draw, as well to tie that obligation to the installation of the equipment.  On its face, it is unclear whether it is intended to mean that the second draw is to be paid "when requested by the vendor at completion and installation of the equipment," but in no event sooner than ninety (or perhaps thirty) days from the first draw—thus relieving Quality from any obligation to make the second payment sooner than ninety (or thirty) days from the first—or whether it is intended to mean that, regardless of when the equipment is installed, the second payment will be made no later than ninety (or perhaps thirty) days after the first draw, but will be made even sooner if the equipment is installed sooner.  Given the provision in the Master Agreement that the "commencement date"

---

[4] Quality made the first payment in February 2019 and the second payment in June 2019, more than ninety days later.  Quality asserts that "[e]ven if the agreement is read to include a 30-day repayment period rather than a 90-day period, the distinction is irrelevant for the purposes of this motion as the Defendants' entire theory is based upon the assertion that Quality's June 2019 funding was premature, not late." [Dkt. 68 at 6.]  But whether Quality complied with what it defines as its two options under the agreement is relevant.  Further, while Quality argues (in a footnote) that Defendants have "failed to produce any supporting evidence to verify its position" that it did not receive all of the equipment that was financed by Supplement 30114, it recognizes that Hoffman testified to that fact. [Dkt. 65 at 15.]  Accordingly, viewing the facts of record in the light most favorable to Defendants, as the non-moving parties, the Court must accept Defendants' version of events as true.  However, the Court notes that, per Hoffman's own testimony, the three components that were not delivered do not appear to be listed on Schedule A.  [Dkt. 65-5 at 18.]

for Atomic's payments "shall not be earlier than the date of the delivery to Borrower and acceptance of all or a substantial part of the Equipment," [Dkt. 65-2 at 11], and considering together all of the documents relating to Supplement)—and resolving the ambiguity against Quality, as the drafter—the Court finds that the form contracts used in conjunction with both Supplement 30144 and 30120 evidence that the parties intended that the first draw would occur upon execution of the "Supplement to Master Equipment Finance Agreement," which would initiate the manufacturing process (or delivery, if the equipment was already manufactured), and the second payment would be made only once the equipment was installed and accepted by Atomic. In other words, the language in question was intended to prohibit Quality from unilaterally making the second payment (and thereby triggering the commencement of Atomic's monthly payment obligation) prior to the delivery and installation of the equipment.

The key word in that sentence is "unilaterally." Quality asserts that it did not unilaterally decide when to make the second payment under Supplement 30144 and did not unilaterally insert the commencement date onto the form contract, but rather was specifically authorized to do so by Atomic. Relevant to this assertion, Quality states the following in its Statement of Material Facts Not in Dispute:

> 15. Subsequent to Quality's payment of the first draw in February 2019 to Palmer which was the vendor chosen by Atomic Dog to supply it with the equipment in February 2019, Palmer Canning contacted the equipment finance broker, Oskar Andalon ("Andalon"), and advised that the second draw payment was required before delivery could occur because the vendor needed to purchase materials necessary to finishing building the equipment that Atomic ordered. . . .
>
> 16. Andalon then relayed Palmer Canning's payment demand to Atomic Dog, through Hoffman. Hoffman, according to Andalon, orally agreed to Palmer Canning's request and authorized Quality to fully fund the equipment prior to the completion and installation of the equipment at Atomic Dog's premises.

13

[Dkt. 65 at 6] (citing [Dkt. 65-6 at 12-13] (Andalon deposition)). The record contains several emails exchanged between Andalon and Hoffman on June 13, 2019, that support Andalon's testimony. First, Andalon emailed Hoffman and stated, in relevant part,

> Here's an overview of where we are on these:
>
> A. **Palmer Canning Line:** 1) Need a written email confirmation understanding the auto pay ACH was signed and accepted on the first set of docs. 2) We are authorized to fund the remaining half to Palmer Tech and commence the lease. 3) The payments are due now and will be collected via ach per the agreement.

[Dkt. 65-6 at 41.] Hoffman replied to Andalon and stated "I approve full funding of Palmer Canning Line ASAP and Atomic Dog will pay first payment of $15,396.97 on June 20, 2019."

*Id.* at 39. Later that day, Andalon emailed Hoffman as follows:

> Donald-
>
> Since the new date of 6/20/19 will be the first payment due date, underwriting requires the attached documents signed and sent back today in order to fund Palmer. I also attached an overnight slip to send the originals.
>
> The amount due now is $11,106.90 for the interim rent from April, when we funded the first half and today. $15,396.97 will be due on 6/20/2019 which commences the lease.
>
> **We need these signed ASAP and returned via email now** so we can fund first thing tomorrow.
>
> Make sure he sends the originals back in Fedex. Label attached.
>
> Call me with any questions on mobile 949.228.4549.
>
> [handwritten: Need check for $26,503.87 w/ docs]

*Id.* at 43. The next day, on June 14, 2019, Hoffman emailed Andalon the executed Supplement 30114 documents and stated: "Please find attached signed docs and a copy of the check. The documents are in FedEx. Please fund the Canning Line and advise me when complete." *Id.* at 51. The check was for $26,503.87, which is the sum of the "interim rent" referenced in Andalon's email and the first monthly payment.

From this evidence, there is no question that a reasonable factfinder could find that, despite what the form contracts were intended to mean when they were drafted by Quality, in June 2019 when Atomic executed the documents associated with Supplement 30114, the parties' intent was for Quality to do precisely what it did: make the second payment to Palmer immediately, despite the fact that the equipment had not yet been delivered. The question is whether Defendants have pointed to evidence that raises a genuine dispute of material fact with regard to this issue.

Defendants' Statement of Material Facts in Dispute contains several assertions relevant to the events in question. First, Defendants note that Andalon acknowledged in his deposition that Palmer's request to be funded prior to delivery "was a very unusual request that created risk for both Plaintiff and Defendants" and that because "the current agreements that were in place would not permit or did not account for full funding without delivery . . . to accomplish full funding without delivery, there would have to be a . . . revision of the agreement." [Dkt. 66 at 3] (citing [Dkt. 65-6 at 24-25] (Andalon deposition)). Defendants then quote the following excerpts from Hoffman's deposition testimony:

> On June 13th, your representative, QL's representative, Oskar Andalon, sent me an e-mail asking me if I was prepared to fund Palmer. It was very confusing, so I picked up the phone and I called him and said your e-mail makes no sense. And his response was, I want to assure that you are prepared to make the funding upon delivery of the equipment, which at that time was expected by June 20, 2020— 2019. And my response was, both verbally, that yes, I was willing to, one, fully authorize full funding upon delivery and, two, commence the payment of 15,396.97 on delivery of all the equipment. At that time, it was my expectation that all of the equipment would be delivered. However, when I sent back my email to Mr. Andalon, it was very cryptic. I just said yeah, I would approve final funding upon delivery and would begin the payment. On the 13th of June, for some reason, unbeknownst to me at the time and only became known to me after the fact, Mr. Andalon forwarded same e-mail to Quality Leasing and said, See following e-mail, you may proceed with final funding. Totally inconsistent with the way we had done both the tanks and the apple press where I signed the

> document before final funding took place. I am surprised that QL did not comply with their own contract here under No. 6, and we didn't sign that contract until the 14th, the very next day. I had no knowledge that Palmer had been paid this final payment until after I appealed to Quality Leasing after I received only a partial installation of equipment in October of 2019.

[Dkt. 65-5 at 10-11.]

> On June 13th, Oskar Andalon, arguably the broker for Quality Leasing, sent me an e-mail asking about the final payment. It seemed strange given the fact that we didn't have the equipment, and we didn't know when it was coming. It was anticipated to be coming on June 20th. I then picked up the phone and called him to get clarification of his e-mail. Upon discussing with him, what he said was I just want to confirm that you're still willing to authorize final payment upon receipt of all the equipment, upon its actual being installed and being delivered. And I said yes. As I've stated before, that, yes, not only would I authorize final payment, but that I would proceed with paying for the final payment, the $15,000-plus that was the monthly payment. I then sent him back an e-mail stating that, but it was very cursive because it was just in response to our individual dialogue. It is my understanding that, subsequently, Mr. Andalon forwarded same e-mail to Quality Leasing without copying me, stating, Please make final payment, see—please see below. Now, it's important that you note, Mr. Dressler, that I and Quality Leasing stood to gain nothing by paying Mr. Palmer early. The only two parties, which served to gain anything by early payment, were Mr. Andalon and Mr. Palmer. So I have no idea why that would occur. So my statement here is because, one, not only did Mr. Andalon misrepresent me to Quality Leasing, but that Quality Leasing appears to have made the final payment inconsistent with Paragraph 6 of 30114 without any approval or checking with me. I did not discover that this final payment had been made until I contacted Quality Leasing in October of 2019 upon not receiving all of my equipment.

*Id.* at 26. Thus, Defendants argue, Hoffman's expectation was that Quality would make the second payment consistent with the language of the Pre-Funding Agreement that he signed on June 14, 2019, which, as discussed above, provided that the second payment would not be made until after "completion and installation of the equipment." [Dkt. 66 at 6.]

Hoffman's testimony directly conflicts with the evidence pointed to by Quality. Specifically, Hoffman testified that his emails with Andolan were intended to confirm that he agreed to full funding upon delivery of the equipment and that Atomic would "commence the

16

payment of 15,396.97 on delivery of all the equipment," but, in fact, Hoffman sent a check for the first monthly payment that same day, prior to delivery, and Atomic continued to make monthly payments through January 20, 2020.[5] Defendants' position also ignores the reference in Andolan's email to "fund[ing[ first thing tomorrow" which, given the reference in the same email to the fact that the first half had been funded in April,[6] necessarily referred to the second payment. [Dkt. 65-6 at 43.]

That said, "'[i]t is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders.'" *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). If Hoffman's testimony is credited, a reasonable factfinder could find that Atomic did not authorize Quality to deviate from the terms of Supplement 30114 and make the second payment to Palmer prior to installation of the equipment. If the factfinder so found, the factfinder also reasonably could find that making the second payment without such authorization was a material breach of Supplement 30114 by Quality that prevents Quality from recovering for breach of that contract by Atomic. *See Koch Dev. Corp. v. Koch*, 996 N.E.2d 358,

---

[5] Quality asserts that Atomic "commenced making the scheduled payments due under Supplement 30114 and made three monthly payments to Quality between July and October 2019." [Dkt. 65 at 7.] In support of this assertion, Quality cites to Hoffman's deposition testimony and its own records. The former does not support the assertion; Hoffman actually testified that Atomic "made payments under the other two [Supplements], but not under 30114, with the exception of the first payment of 42,000-and-something." [Dkt. 65-5 at 12.] The latter also does not appear to support the assertion, as it lists several "returned transactions" in the amount of $15,396.97 during the months in question. [Dkt. 65-2 at 61-62.] However, Hoffman's affidavit submitted in opposition to the instant motion states that Atomic "made regular payments under Supplement 30114 through January 30, 2020, with the exception of certain months in which Plaintiff permitted [Atomic] to defer payment." [Dkt. 66-1 at 4.]

[6] Quality now asserts that the first payment was made in February 2019, not April.

376 (Ind. Ct. App. 2013) ("[I]t is well-established Indiana law that 'where a party is in material breach of a contract, he may not maintain an action against the other party or seek to enforce the contract against the other party.'") (quoting *Wilson v. Lincoln Fed. Sav. Bank,* 790 N.E.2d 1042, 1048 (Ind. Ct. App. 2003)). Accordingly, summary judgment is not appropriate on Quality's claims relating to Supplement 30114; a trial will be necessary to determine the actual circumstances of Quality's second payment to Palmer and whether that payment constituted a material breach of the parties' contract such that Quality may not enforce the contract against Defendants.

### C. Failure to Continue Payments Required by Supplements 30120 and 30151

As Quality properly points out, Defendants do not dispute that they have not made all of the required payments under Supplements 30120 and 30151. In their Statement of Material Facts in Dispute, Defendants state the following:

> Plaintiff contends that Atomic Dog has improperly withheld payments on Supplements 30120 and 30151. However, Atomic Dog made payments consistent with Supplement 30151 through January 20, 2020, with the exception of certain months in which Plaintiff permitted Atomic Dog to defer payment. See Defendant's Exhibit A, ¶6. Atomic Dog also made payments consistent with Supplement 30120 through January 20, 2020, with the exception of certain months in which Plaintiff permitted Atomic Dog to defer payment. Defendant's Exhibit A, ¶7. Further, despite the non-delivery of the equipment financed under Supplement 30114, Atomic Dog made regular payments under Supplement 30114 through January 20, 2020, with the exception of certain months in which Plaintiff permitted Atomic Dog to defer payment. Defendant's Exhibit A, ¶14. On January 31, 2020, Mr. Hoffman sent correspondence to representatives of Plaintiff informing them of the non-delivery of the equipment identified above, and its impact on Atomic Dog's ability to complete construction and conduct business. Defendant Hoffman proposed that payments continue on Supplement 30114, which Defendant Hoffman referred to as the "canning line," on a prorated basis for the equipment actually delivered by Palmer Canning Services. Because Atomic Dog was making combined monthly payments on all three supplements, Defendant Hoffman wanted to determine this figure before continuing to make payments. Accordingly, Defendant Hoffman informed Plaintiff's representatives that Atomic Dog would not be making further payments until the prorated figure

for Supplement 30114 could be determined. Defendant's Exhibit A, ¶15. On February 11, 2020, a representative of Plaintiff responded to inform Defendant Hoffman that Plaintiff insisted on full payment of Supplement 30114, despite Plaintiff's non-compliance with Supplement 30114. Defendant's Exhibit A, ¶16. Over the next six weeks, Defendant Hoffman made additional efforts to reach agreement with Plaintiff concerning satisfaction of all supplements, including proposing that payments continue on Supplements 30151 and 30120 and that prorated payments be made on Supplement 30114. Plaintiff made no response to those proposals other than demanding full payment and late fees up to the date the lawsuit was filed on March 26, 2020. Defendant's Exhibit A, ¶17.

[Dkt. 66 at 6-7.] Defendants then make the following argument:

> As set forth above, Defendants have advanced evidence demonstrating that they should not be found in default on Supplement 30114 because Plaintiff materially breached the terms of the supplement. Plaintiff contends that Defendants withheld payments on Supplements 30120 and Supplement 30151 in an effort to "gain leverage" with respect to the dispute over Supplement 30114. However, Defendants have consistently confirmed to Plaintiff that they are prepared to resume making payments on Supplements 30120 and 30151. Plaintiff's response was to file suit on **all three** supplements—to in effect "gain leverage" over Defendants concerning Supplement 30114 by seeking default damages on all three supplements, including those Defendants have consistently voiced a willingness to continue to pay. Defendants are not opposed to an order requiring them to resume payments on Supplements 30120 and 30151, but Plaintiff is not entitled to an award of default damages and attorney fees concerning debts over which no lawsuit was needed.

[Dkt. 66 at 12.]

Quality's argument is again quite simple: by failing to make the required payments, Atomic breach Supplements 30120 and 30151 and, in light of the fact that the agreements are cross-collateralized and cross-defaulted, Atomic "is deemed to have defaulted under *all* three Supplements." [Dkt. 68 at 3.] However, neither party has adequately addressed how the breach of Supplement 30114 by Quality—if such a breach ultimately is found—affects Quality's ability to recover for Atomic's subsequent breach of Supplements 30120 and 3015. "It is not this court's responsibility to research and construct the parties' arguments." *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011). Accordingly, this issue will also be addressed at trial.

19

### IV. Conclusion

For the reasons set forth above, Quality's motion for summary judgment [Dkt. 64] is **DENIED**. In light of this ruling, Quality's Motion for Entry of Order for Turnover and Writ of Replevin and for Disabling of the Equipment [Dkt. 43] also is **DENIED**.

This case remains set for a final pretrial conference on October 14, 2021, and a bench trial on November 8, 2021. The parties are reminded of their pretrial filing obligations, which are set forth in the case management plan in this case. *See* [Dkt. 21 at 5].

SO ORDERED.

Dated: 19 AUG 2021

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.